JUDGE GOFER
delivered the opinion ok the court.
Hamilton & Brothers & Co. were pork-packers and commission merchants doing business in the city of Louisville, and the appellants, Sawyer, Wallace & Co., were commission merchants doing business in the city of New York, and members of the New York Cotton Exchange and of the New York Produce Exchange.
Commencing in December, 1875, Hamiltons, from time to time, directed Sawyer, Wallace & Co. to buy for their, account, for future delivery, certain specified quantities of cotton, pork, and lard.
Hamiltons knew that Sawyer, Wallace & Co. were members of the cotton and produce exchanges, and expected the purchases to be made on ’change, subject to the rules and regulations of trade in New York, and were notified, from time to time, that purchases had been made as directed. As the time approached when, according to the terms of the contracts of purchase, the goods were deliverable, Hamilton & Brothers & Co. directed the purchases to be “ transferred ” to subsequent months. This, as the evidence shows, was intended and understood to be a direction to sell the goods and purchase a like quantity for delivery in the months designated.
The regulations of the exchanges require that all contracts made on ’change shall be made in the names of members, and Hamiltons not being members, the purchases made for them were made in the name of appellants, who became liable on *731 the contracts as principals; When they made sales at less than the purchase-price, being bound on the contracts as principals, they advanced the amount necessary to cover the loss and advances so made, and brokerage and other expenses growing out of these transactions make up the greater part of their claim asserted in this action.
The appellees resisted this part of the claim, and it was rejected in the court below on the ground that the transactions were mere illegal wagers on the market-prices of cotton, pork, and lard; “that it was contemplated by Sawyer, Wallace & Co., Hamilton & Brothers & Co., and all connected with said transactions, that when the time came for the delivery of said cotton, pork, and lard, the ■ same should not be delivered to the party so pretending to purchase, but that said party should, pay or receive, as the case might be, the difference between the market price in New York city at the time of such pretended purchase, and the time fixed for the delivery of such article;” i. e. the difference between the contract-price and the market-price on the day of delivery.
Whether those transactions were of that character is the sole question in this case which we deem it necessary to discuss.
The evidence shows that Sawyer, Wallace & Co., in each instance when directed to buy, went upon the exchange and there entered into agreements, with third persons, which on their face constituted valid and enforcible contracts for the delivery of the goods directed to be purchased. Many of the contracts thus entered into are exhibited in.the record, and the names of all persons with whom contracts were made are given.
All the witnesses for Sawyer, Wallace & Co., who testify from their personal knowledge of the transactions, testify that there was no agreement or understanding between Sawyer, Wallace & Co. and Hamiltons, or between Sawyer, Wallace *732 & Co. and those with whom they,made contracts, that the goods contracted for should not be delivered and paid for according to the teivms of the written contracts, or that the contracts should be settled by the payment of differences. One of the members of the firm of Hamilton & Brothers & Co. testified that his firm never intended to receive the goods they directed Sawyer, Wallace & Co. to buy, but that they desired to have made on their account contracts which they could enforce if they chose to do so; that their intention was to resell the goods before the time arrived for delivery, and this latter intention was, we think, known to Sawyer, Wallace & Co.
The evidence also showed that before the maturity of each contract, Hamiltons directed the goods contracted for on their account to be sold, and that Sawyer, Wallace & Co. went on ’change and made contracts for the sale, for account of Hamiltons, of goods corresponding in quality and kind with those they had purchased for them, déliverable at corresponding dates; and the names of the persons to whom these sales were made are given in the record.
Rules of the exchanges, made part of the contracts, respectively provide that deliveries of goods sold for future delivery shall be made in the following manner:
The seller shall give written notice to the buyer that he will deliver on a named day. If the seller has resold the goods, he passes the notice to his vendee, and so on until it reaches a vendee who has not sold. The seller must then deliver to the buyer a transferable order, or an order on a warehouse or place of delivery before 12 m. of the day preceding that on which the delivery is due. If the buyer has not resold, he is bound to present the order and receive and pay for the goods. If he has sold he passes the order to his vendee, and so on until it reaches a vendee who has not sold, and he is bound to receive and pay for the goods at the original *733 contract-price, the difference between that price and the price of each subsequent sale being settled between the immediate parties to such sales. The rules also provide that delivery-orders shall be received by any member of the exchange to whom goods of the kind called for in it are due from another member.
The evidence shows that in every instance notice of delivery and the usual delivery-ox’ders were received by Sawyei’, Wallace & Co. from the seller, and were passed by them to those to whom they had sold for account of Hamiltons.
Having shown that they entered into conti’acts valid on their face for the purchase of the goods they were directed to buy for Hamiltons, and that, pursuant to directions, they resold the goods and delivered to the purchasers from them delivery-orders which they had received, and that on such resales there were losses, which they paid, they have made out a clear prima fade right to recover, and unless it has been shown that, on account of something not appearing oxi the face of the transactions, they were in some way illegal, the judgment of the court below must be reversed.
No direct evidence was offered to prove the presence, in any of the transactions, of any element of illegality.
An effort was made to prove — and, for the purposes of this ease, we assume that it was successful — that none of the persons with whom Sawyer, Wallace & Co. made contracts for purchases had the goods contracted for on hand at the times of entering into the contracts, and that they had no reasonable expectation of acquiring them except by purchasing in the market. But that fact did not render the contract unenforcible, much less vicious. (Whitehead v. Root, 2 Met. 587; Hibblewhite v. McMorine, 5 Mess. & Webb, 462; Grizewood v. Blane, 73 Eng. Com. Law, 536; Stanton v. Small, 3 Sand. 230.)
And we may here remark that there is no evidence that *734 the sellers did not in fact make delivery upon each of these contracts to those to whom sales had been made, or that- any of the contracts were settled by the payment of differences. But it is immaterial how they may have been settled.
If they were entered into without any mutual agreement, tacit or express, that they were not to be performed by delivery of the goods and payment of the price, they were valid, and no subsequent agreement to settle them by the payment of differences could render them invalid.
There is not only no direct evidence that any such agreement was made at the time the contracts were entered into, but there is the direct and positive statement of each of the partners composing the firm of Sawyer, Wallace & Co. that •there was not; and the names of those with whom the contracts were made having been furnished, ample opportunity was afforded the other side to contradict this evidence. In view of this state of the record there is no pretense for saying that there was any such express agreement, and counsel do not claim that there was. But they do claim that there is evidence to show that it was tacitly understood by all the parties that delivery and payment were not to be made, and that the transactions would be closed by the simple payment of differences. The only evidence tending to establish such an understanding is, of course, circumstantial.
It is contended that it has been proved, and it may be conceded, that a large proportion of similar contracts is in fact so settled. But it is equally proved that a very large business is done on similar contracts by dealers, manufacturers, and shippers who receive and pay for the goods. Nearly the entire business in what are called futures is carried on on the exchanges, of which nearly all large dealers are members. The exchanges are corporations created and recognized by the laws of the state of New York. It is not even claimed that there is not much legitimate business done on ’change. The trans *735 actions for Hamiltons were conducted in the same manner in which all legitimate transactions there are conducted, and the fact that they were entered into there has no greater tendency to prove that they were illegal than the same fact has to prove all other transactions there are also illegal.
That there is much most mischievous gambling carried on on exchanges and boards of trade no one can doubt, and that the New York cotton and produce exchanges are no exception in this respect, we think, is shown by the evidence in this case; but as there is also much legitimate business done there, the only effect which the fact that the contracts in question were made there ought to have in a case like this is to induce a more rigid scrutiny of the other facts relied upon to show that the object was to gamble under the forms of legitimate trade.
Sales for future delivery have long been regarded and held to be indispensable in modern commerce, and as long as they continue to be held valid, one who buys for future delivery has as much right to sell as any other person, and there can not, in the very nature of things, be any valid reason why one who buys for future delivery may not resolve, before' making the purchase, that he will resell before the day of delivery, and especially when, by the rules of trade and the terms of his contract, the person to whom he sells will be bound to receive the goods from the original seller, and pay him the contract-price.
The objection to commercial gambling is that men enter into fictitious.contracts, and buy and sell upon contracts never intended to be performed by themselves or any one else, but the character of their transactions being unknown to the public, they are regarded as real, and so affect prices and trade without having any legitimate connection in fact with either.
But if A, desiring to engage in trade,, enters into a contract with B for the purchase of an article for future delivery *736 and becomes bound to receive and pay for it, that is a real transaction, and is valid whether made in the country or on ’change. What difference, then, is made in the nature or character of the transaction if, instead of intending to receive the article himself and pay for it, he intends to resell it, and thereby procure another to receive and pay for it in his stead?
The material matter is that the contract shall be such that its performance can be enforced. If, in the case put, A does not, by reselling, procure another to perform the contract for him, he is bound to perform it himself.
So with the contracts in question here. Hamiltons did not intend themselves to receive and pay for the cotton, pork, and lard purchased for them, but there being no agreement between them and Sawyer, Wallace & Co., or between the latter and those with whom they contracted, that the contracts should be settled by the payment of differences, Sawyer, Wallace & Co. would have been bound to receive the goods from those from whom they purchased, and Hamiltons to receive them from Sawyer, Wallace & Co. But although Hamiltons did not intend to receive the goods, they intended to resell them, and, having done this, their vendees became bound in their stead to receive the goods and pay for them.
But counsel contend that it is not shown that the goods bought for Hamiltons were resold; that sale may have been made of an equal quantity of the same kind of goods, but that this was not a resale of the same identical goods, and therefore that there is no evidence that the persons to whom sales were made for their account became bound to perform the contracts made for them.
To this argument there are two conclusive answers: From the very nature of a contract of sale for future delivery, the sale is not of ascertained articles, but of articles of a designated kind, to be selected at the time of performance, and may *737 be discharged by the delivery of any articles answering to the general description given in the contract.
Neither the goods purchased nor those sold for account of Hamiltons were ascertained when the sales for their account were made, but the evidence shows that the delivery-orders received from those from whom purchases were made for them, and which represented the property purchased, were passed to those to whom sales had been made, and thus represented the property sold.
And, again, if the identical goods were not resold so as to obtain some one else to receive and pay for them, Sawyer, Wallace & Co. remained bound to do so, and the contracts were thus in any event to be performed by some one. The fact that Hamiltons intended not to receive and pay for the goods, but to resell them, furnishes no ground for holding that it was tacitly understood that the contracts were not to be performed, and were to be settled by the payment of differences.
It is next contended that such understanding is, shown by the fact that in the whole course of dealing between Sawyer, Wallace & Co. and Hamiltons, extending over a period of about two years, and amounting in the aggregate to several hundred thousand dollars, no goods were ever actually received by either on account of any of said transactions.
This argument would have much force but for the fact that all these transactions were had with the same intention to resell, and the further fact that sales were actually made in all instances, just as in those we are considering. If one such transaction might be legally had, then many made with the same object in view would be equally lawful.
But instead of furnishing evidence of a tacit understanding that the contract was to be settled by the payment of differences, this long course of dealing, in which it does not appear that any contract was so settled, rather conduces , to disprove the existence of such an understanding.
*738 Another matter relied upon is the fact that it often happens that contracts are entered into in one month on the New York Cotton Exchange for the sale of a greater number of bales of cotton than are in store in all the ports in the United States.
This argument is not sound.
As already seen, sales for future delivery are legal, and one who has purchased for future delivery may resell.
In this way the same bale of cotton may be sold many times in one month, and thus the aggregate of sales may greatly exceed the stock on hand or in the country, and yet all the contracts may be not only legal, but may in fact be performed.
But counsel contend that the rules of the New York Exchange are so framed, and the course of dealing there is such, that deliveries can not be enforced, and that this proves, or tends to prove, that the parties understood these contracts were not to bp enforced. Rules 4, 6, and 8 of the cotton exchange are indicated as establishing this view.
Rule 4 provides that either party to a contract may close or cancel it upon notice, in writing, to the opposite party at any time before notice of delivery. But how ? The rule goes on to provide that “ the party to whom notice is given has the option either to make settlement (i. e. to pay or receive the difference), or to receive a satisfactory contract made equal to that held by him.”
Upon such a notice being given, the party receiving it is not compelled to accept settlement by payment of differences. He has, by the express language of the rule, the “ option ” to demand another contract equal to that held by him. The only effect of the rule is, that if the party giving the notice can procure a party satisfactory -to him to whom notice has been given to take his place and perform the contract, the contract of such person must be accepted in lieu of the original contract. This is but a reasonable regulation, which, while it does *739 not deprive the party receiving the notice of the right to demand the thing purchased, or to deliver and receive payment for the thing sold, may be, and doubtless is, of great practical value and importance to trade, and in no way tends to facilitate fictitious trading or gambling on market-prices.
Practically, the rule amounts to this, that the party to whom notice is given must pay, or accept payment of the difference, or accept a satisfactory person in the room and stead of the party giving the notice, and discharge him and look to his substitute for performance of the contract.
Rule 6 relates to margins, and we do not perceive that it has any bearing upon the question in this ease.
Rule 8 relates to settlements when there has been default in delivering or receiving cotton due on a contract. It provides that in such cases the seller making default shall settle at one quarter of a cent per pound above the average quotations for spot cotton of the day of delivery, and that a buyer making default shall settle at the average quotations for spot cotton of the day following, with the addition of one quarter of one cent per pound in favor of the seller; and it also provides that “no defaulting party can claim settlement under this rule, except upon evidence that the default was unintentional, and not premeditated.”
. Liability for such a penalty for default, and a provision for this summary mode of making settlements in such cases, would seem to be a sufficient and salutary guaranty for the performance of contracts, and instead of affording facilities for, or furnishing evidence of, gambling on the turn of prices, seems well calculated to insure that good faith and promptness so indispensable in commercial transactions.
Without noticing other provisions of the rules, it may be remarked that they seem to provide for real and not fictitious trade; that they provide against unreal transactions; and that so large a portion of the real business in the great cities is *740 done on ’change as to wholly forbid the conclusion that all contracts made on them are unlawful, and unless such conclusion could be reached, the contracts involved here must be held to have been valid and lawful.
This conclusion is, we think, well sustained by both reason and authority, and is not opposed to any authority to which our attention has been called.
In Ashton v. Dakin, 4 Hurl. & Norm. 867, the facts were these: The plaintiff was a broker, and was directed by the defendant to buy for him certain stock for future delivery. The plaintiff bought the stock through another broker, who made the contract in his own name, and became liable for its performance.
Before the day of delivery the defendant ordered the stock to be sold, and it was sold at a, loss, which the broker paid. The plaintiff repaid the broker, and brought his action for the amount. The defendant pleaded that the transaction was a mere wager on the market-price of the stock.
The arbitrators found that the defendant never, in fact, intended to take a transfer of the-stock, and that the plaintiff was fully aware of this when the orders were given, and that they were given and accepted on the implied terms and understanding that the plaintiff should not be called on by the defendant to deliver the stock or any part thereof, and that the defendant should not be called on to receive or pay for it; but that it should be resold by the plaintiff before the time of .payment arrived, and the defendant should, on the resale, either pay or receive the difference, after debiting him with the plaintiff’s charges on the purchase and resale.
This was held not a gaming transaction.
There as here there had been many similar transactions between the parties.
Under the rules of the London Stock Exchange, where *741 the purchases were made, the purchaser was entitled to a transfer of the stock, but never actually received it. So here, under the rules of the New York Exchange, the purchaser was entitled to demand the delivery of the cotton, pork, and lard, but did not receive it.
There, as here, the thing was resold before the day of ■ delivery, but there is this difference between the cases: In that the agreement originally made was that there should in no event be a delivery to the purchaser, while in this there was no such agreement, but the purchaser might have refused to sell and have demanded a delivery of the goods.
But counsel say that was an actual transaction; that there was an actual purchase of stock. It was no more an actual transaction than those in this case. Here, as there, there was a purchase and a resale. Here it appears that, by the rules of the exchanges, the purchasers had a right to demand that the thing contracted for should be delivered either to themselves or their vendee, immediate or remote; that they did resell and transfer the right to demand delivery just as in the case supra, and as the wendees were legally bound to receive and pay for the goods, we ought to presume they did so. But it is wholly immaterial whether they did so or not. It is enough that it is not shown that there was any understanding or agreement, tacit or express, that the goods would not be delivered and paid for, and that, in the absence of such agreement, they were legal and enforcible.
In Smith v. Bouvier, 70 Pa. St. 325, the. Supreme Court of Pennsylvania defined a gaming contract to. be one in which it is agreed or understood in the beginning that the thing dealt for is not intended to be delivered, but the parties are to settle their mutual wagers on the price by paying the difference between sales at different times.
There are many other cases in which the same question arose, and they all hold substantially the same language, and *742 turn upon the question, whether there was an agreement or understanding, tacit or express, between the parties at the time of entering into the contract, that the thing contracted for was not to be delivered and paid for according to the tenor of the contract.
We fully concur in the principle upon which these cases were decided; but we find in this case no sufficient evidence that any such understanding or agreement existed between the parties as renders the contracts illegal.
That no actual delivery was ever made directly to Hamil- . tons, or to the appellants for them, proves nothing. This was not expected or intended, and was not essential to the validity of the contracts. No case has been found in which it has been held that the fact that no delivery was made or intended, was of any importance where it also appeared that the purchaser intended and had resold before the time for delivery, and thereby procured another to become bound to receive and pay for the goods in his stead.
Counsel cite Kirkpatrick, &c. v. Bonsall, 72 Pa. St. 155.
The contracts there were of the cl&ss known as “puts” and “ calls.”
In consideration of $1,000, for which the plaintiff executed his note to the defendants, they undertook to deliver to the plaintiff, if he should call upon them to do so at any time during the first six months of 1871, five thousand barrels of petroleum at ten and a half cents per gallon. i
The plaintiff called for the oil, and the defendants failing to deliver it, suit was brought on the contract.
The court held that the contract was valid on the face of the writing, but its form, it was intimated, was suggestive of gambling; the number and amount of similar contracts entered into by the plaintiff about the date of the contract in question; his inability to pay for his purchases; the fact that he was not a dealer in or refiner of oil; that he had not sold *743 it at the time he made the call, and his own declaration on the witness-stand, that he would not have called for the oil if the price had not advanced beyond what he was to pay, were facts proper to go to the jury, to show that there was no intention to deal bona fide, but that the transaction was a mere betting upon the market-price of oil.
That case is wholly unlike this in its facts and circumstances.
The contracts in question here were in the form in constant and universal use on the New York Cotton and Produce Exchanges ; they were entered into in the usual course of business ; the transactions, though large in the aggregate, never at any time went beyond what might have been justified by the means and commercial credit and standing of Hamilton & Brothers & Co. They were merchants, and in the habit of dealing in these commodities, and they avowed on the witness-stand that they did not intend to gamble; that is, they stated that the purpose and expectation was that contracts should be made, upon which they could demand and receive the goods if they should at any time desire to do so, and that when they did not desire to receive they proposed not to make settlements by receiving or paying the difference, but by a resale.
Brua’s appeal, 55 Pa. St. 294, is also cited by appellee’s counsel.
That case involved the validity of certain promissory notes, given non account of an alleged purchase of stocks for future delivery.
The circumstances attending the transaction are not stated in the report of the case, and the intention of the parties in entering intp it only appears from the finding of the arbitrators.
They found that “ doubtless the contract and the four notes were the component parts of a stoek-gambling transaction, in which Kaufman (the maker of the notes) in effect betted that *744 in twenty-five days Harlem stock would sell at less than $60 per share.”
The court said, “ Facts found by auditors are conclusive, unless shown to be in clear mistake; that is not pretended here;” and of course the decision was against the validity of the notes. That was merely to decide that notes given for a gaming consideration can not be enforced, but the case furnishes no light that can aid us in determining a question which the arbitrators in that case had conclusively settled upon evidence not reported. The case decides that stock gambling is unlawful, and nothing more. What amounts to stock gambling was not even a question in the case.
In Sampson v. Shaw, 101 Mass. 145, also cited for the appellee, the only point decided was, that an agreement to make a “ corner ” in stock, by buying it up so as to control the market, and then purchasing for future deliveries, is illegal.
Cassard v. Hinman, 1 Bos. 207, decides that a contract of sale for the delivery of goods at a future day is valid in law, although the goods at the date of the contract are not in the possession, nor within the control of the seller; and a contract, though valid on its face, is illegal if it was the intention and understanding of the parties, when it was made, that the goods were not to be delivered, and the difference between the contract-price and the market-price on the day stipulated for delivery should be paid by one and accepted by the other in lieu of performance according to the terms of the contract. The question arose in that case on demurrer to the answer, in which it was alleged that at the time of making the contract it was not the intention of either party to make any actual sale or delivery of, or to receive the thing contracted for, but that it was the mutual design and intention of the parties that the contract should be specifically performed, but their design and intention was that only the difference should be paid.
The court held the answer good, but the evidence on which *745 the defendant relied to establish the fact that such design and intention existed is not, of course, in the report, and therefore the case, like Brua’s appeal, furnishes no assistance in the decision of this case.
In Grizewood v. Blane, 73 Eng. Com. Law, 525, two contracts were entered into between the parties. By the first B contracted to sell to A certain shares of stock at a fixed price. By a subsequent cofitract A agreed to sell to B a like number of shares of the same stock, but at an advanced price. B sued to recover the difference between the prices stipulated in the two contracts, and A pleaded that the transaction was a mere wager. The court held that the real question was whether the parties intended to buy or sell, and that the evidence warranted the finding of the jury that they did not, and judgment was given for the defendant. The evidence showed that the plaintiff was a stock-broker, and that the defendant had contracted to sell and repurchase the shares, and that there had been former dealings between the parties, of the same character, no shares passing, but merely settlements of differences.
In no instance did the parties here settle any transactions between them by the payment of differences. Besides, there was no resale by the purchaser to the seller, which, in view of the former dealing between the parties in the case supra, was of -itself strong evidence of an understanding that no shares were to be delivered.
These authorities seem to üs to be not inconsistent with the conclusion we have reached, and the judgment must be reversed, and the cause remanded for judgment in conformity to this opinion.
This case presents a question similar to that decided in Ferguson v. Northern Bank of Kentucky, &c., but we need not discuss it here.