ELMER A. KENT ET AL., Respondents, v. EUGENE B. MILTENBERGER, Appellant.

May 1, 1883.

1. CONTRACTS — WAGERS — EVIDENCE. — A contract, though valid on its face, may, by extrinsic evidence, be shown to have been, not a commercial transaction, but a mere wager on the future state of the market.

2. —— BURDEN OF PROOF. — The burden is on him who seeks to show the invalidity of a contract which is valid according to its expressed terms.

8. —— WAGERS. — An agreement by which it is understood by the parties at the time that there shall be no delivery of the commodity sold, but, instead thereof, a settlement of differences according to the market fluctuations, is a wager and void.

4. —— A contract for the sale of goods for future delivery may be valid though the vendor has not the goods on hand to fill the contract.

5. —— BROKERS. — One who is not a dealer in a certain commodity may employ a broker to sell for future delivery, and to execute this contract of sale by purchasing such commodity for delivery or by settling with the purchaser upon a waiver of delivery.

6. —— PRINCIPAL AND AGENT. — A principal cannot avoid his liability to a broker for commissions and advances in making sales for future delivery, by setting up that his intention in making the sales was to wager upon the future price of the commodity sold, of which intention the broker had knowledge.

7. —— Under the rules of the St. Louis Merchants' Exchange, a broker can charge against his principal only such loss as is sustained by selling on an average and fair market, and the burden of making this proof is on him.

APPEAL from the St. Louis Circuit Court, LINDLEY, J. *Reversed and remanded.*

OVERALL & JUDSON, for the appellant: Although the form of the contract to buy or sell for future delivery is on its face legitimate, the intent to bet or wager on market fluctuations by settlement of differences only, without delivery, is illegal, and against public policy. — *Waterman* v. *Buckland*, 1 Mo. App. 45; *Williams* v. *Tiedemann*, 6 Mo. App. 269. If the original contract of employment is tainted with illegality; if plaintiffs were knowingly employed for the purpose of furthering an illegal intent, even under the guise of legitimate transactions, they cannot recover on the implied agreement of reimbursement under said contract of employment for losses sustained, or commissions earned therein. — *Armstrong* v. *Toler*, 11 Wheat. 258; Whart. on Ag., sects. 25, 319, 324; *Fareira* v. *Gabell*, 89 Pa. St. 89; *Barnard* v. *Backhaus*, 52 Wis. 593; *Tenny* v. *Foote*, 4 Bram. 600; s. c. 95 Ill. 99; *In re Green*, 7 Biss. 338. There was manifest error in the ruling that the burden of proof was

upon defendant to prove the true value of August wheat in the St. Louis market on August 31, 1880.

GIVEN CAMPBELL, for the respondent: In order to make a contract waging, neither party thereto must intend an actual sale, and the defendant alleging a wager must prove it. — *Williams* v. *Tiedemann*, 6 Mo. App. 269. Such is also the law in all the states. — *Pixley* v. *Boynton*, 79 Ill. 351; *Corbett* v. *Underwood*, 83 Ill. 324; *Story* v. *Solomon*, 71 N. Y. 420; *Harrison* v. *Tombudge*, 83 N. Y. 99. If neither plaintiff nor his vendees intended an actual sale and delivery, then if the broker knew that he was conducting a wager, he could not recover, but such a case was not asked by the instructions offered by defendant, and refused. Under the evidence in this case the proof is all on the side of an actual sale to the vendees, and delivery is shown of most of it. All the cases hold that in a case of this kind the agent can and ought to recover. — *Lehman* v. *Strassberger*, 2 Wood's C. Ct. 554; *Sawyer* v. *Taggart*, 14 Bush, 727; *Durant* v. *Burt*, 98 Mass. 167; *Brooks* v. *Martin*, 2 Wall. 70–78; *Kingsbury* v. *Kirwan*, 11 J. & Sp. 451.

THOMPSON, J., delivered the opinion of the court.

This is an action to recover a sum of money claimed to be due to the plaintiffs from the defendant, on account of certain sales of wheat for future delivery made by the former, as brokers for the latter, on the floor of the Merchants' Exchange of St. Louis. The sales were of the aggregate amount of fifty-five thousand bushels, a part of it deliverable at any time during the month of August, 1880, a part of it at any time during October, at the option of the seller, and a part at any time during that year, at the option of the seller. These sales were made at different times and represent several different transactions. Each of them was made by a contract in writing by the plaintiffs, acting toward the other contracting party as principal contractors. These

contracts were all made in the same form upon a printed blank which is used for that purpose.   One of them, which was put in evidence, will serve as an example of all the others.   It reads as follows : —

"(88 3-4 c.)        GRAIN CONTRACT.

"ST. LOUIS, July 31, 1880.

"We have this day bought of E. A. Kent & Co. five thousand bushels No. two red winter wheat at eighty-eight and three-quarters cents per bushel, to be delivered at sellers' option, during the month of October, 1880, in regular elevator.   This contract is subject in all respects to the rules and regulations of the Merchants' Exchange of the city of St. Louis.

"REDMOND, CLEARY & CO.   B."

It is thus perceived that these contracts were what are known in the slang of the exchange as " option deals," the seller having an option to make delivery of the commodity sold within certain days.   There is much evidence in the record as to the general character of these contracts and the manner in which they are executed and discharged.   It appears that delivery is always contemplated, not as a thing which will be necessarily insisted upon, but as a thing which the purchaser may insist upon.   It sufficiently appears that this is the one thing which gives vitality to such contracts and which enables those who, during a particular month are on the successful side of them, to get up what is known as a " corner."   This happens when a much greater amount of any given commodity has been sold for future delivery within a given period than can be purchased in the market. The buyers, who are called in the slang of the exchanges the " longs," then insist upon delivery, and by this means succeed in running up the prices to a fictitious point, at which the " deals " are " rung out," between the dealers by the payment of differences, or, where the purchasers in-

sist upon it, by actual delivery. A very large majority of these transactions are, no doubt, merely speculative, but many of them are actual purchases by manufacturers and exporters. For instance, a miller knows that in his business he will consume so many thousand bushels of wheat during a certain month. When the market is favorable he buys upon the exchange this much wheat upon one of these contracts, by which the seller has the option of delivering the wheat at any time during the succeeding month; and an exporter, forecasting the market, may buy for exportation in the same way.

The defences to this action were, that the contracts were gambling contracts, mere wagers or bets, on the future state of the market, and that some of them were settled on the basis of a fictitious and manipulated market, contrary to the rules of the Merchants' Exchange, which settlement resulted in the loss which the plaintiffs are now asking the defendant to make good.

1. As to the validity of these contracts. From what has been said concerning them, it appears that there is no essential difference between them and the numerous contracts of the same kind which have been before the courts in England and in this country, and which have been almost uniformly upheld as valid contracts. All these decisions unite upon the proposition that these contracts are presumptively valid, but that, though valid on their face, they may be shown by extrinsic evidence to have been intended by the contracting parties, not as commercial transactions, but as mere wagers on the future state of the market; that the one thing which makes them wagers and renders them invalid is an agreement between the contracting parties, made at the time of the contract and understood as part thereof, that the contract may be discharged by the seller, not by the delivery of the commodity sold, but by paying to the purchaser the difference between the market price on the last day of the performance of the contract and the price at which the sale was

made; or, on the other hand, that the purchaser, if the market goes the other way, shall not be bound to receive the commodity purchased, but may settle by the payment of a difference; and that such an agreement will not, if made subsequently to the making of the contract itself, taint the contract and render it invalid in law. *Sawyer* v. *Taggart*, 14 Bush, 727, 734; *Williams* v. *Tiedemann*, 6 Mo. App. 269.

This agreement, contemporaneous with the contract, that it may be discharged, not by actual delivery, but by the payment of differences, or by " ringing out," as it is expressed in the slang of the exchanges, is therefore the one thing which renders the contract void. That was the agreement in *Waterman* v. *Buckland* (1 Mo. App. 45), and this court held the contract void, just as we should do now if the evidence disclosed a like contract. But there is no evidence in this case of such an agreement, either between the plaintiffs and the defendant, or between the plaintiffs and the parties to whom they sold the wheat for the defendant. There was therefore no question to go to the jury as to whether or not this was a gambling contract, unless the learned counsel for the defendant was right in another proposition which we shall consider.

The defendant was, like the plaintiffs, a member of the St. Louis Exchange. He was not, however, a dealer in grain, but he dealt in liquors. He had no wheat to sell in the sense of having it in his actual possession, or expecting to have it in his actual possession, and he did not wish to buy any wheat, in the sense of receiving it in kind, for any purpose connected with the business in which he was engaged. He simply bought and sold, as hundreds do, for speculation. There is nothing unlawful in this. The law puts no restraint upon trade which renders it unlawful for a man to buy or sell commodities in which he does not generally deal, if he thinks he can catch a favorable turn of the market and make money by so doing. What one man is at liberty to do in this respect another man is equally at liberty to do. Furthermore, the fact that a man

does not have on hand a commodity which he undertakes to sell for future delivery at the time when he makes the sale, and that he does not expect to have it on hand until the time arrives for delivery, but that he expects then to go upon the market and purchase it for delivery in pursuance of his contract, does not in any degree impair its validity. *Williams* v. *Tiedemann*, 6 Mo. App. 269 ; *Nibblewhite* v. *McMorine*, 4 Mee. & W. 462 ; *Sawyer* v. *Taggart*, 14 Bush, 727 ; *Smith* v. *Bouvier*, 70 Pa. St. 325. What he may do by himself in this respect he may obviously do by the agency of another. He may employ a broker to make the contract for him and to execute it for him, in any manner in which it would be lawful for him to make it and execute it if acting for himself in person. Any man, although not a dealer in wheat, may therefore lawfully employ a broker on exchange to sell wheat for him for delivery at a future time and to execute the contract for him by purchasing upon the market the wheat for delivery when the time arrives for its delivery, or by settling with the purchaser by the payment of the difference between the contract price and the market price, if the purchaser shall waive the execution of the contract by the delivery of the wheat, according to its terms.

Now, that was precisely the contract which the defendant made with the plaintiffs in each of the transactions involved in this suit. There was not only no agreement that the contracts which the plaintiffs made for the defendant should be settled without delivery, but the contracts on their face imported the contrary, and not a word was written or said indicating that it was the intention that the contracts should be in any respect different from what they purported to be on their face. Both the plaintiffs and the defendant, being members of the exchange, knew that contracts of this kind, made on the floor of the exchange, and subject to the rules of the exchange, would have to be executed by actual delivery, if delivery should be insisted upon.

They moreover knew that the plaintiffs, placing themselves, under the rules of the exchange, toward the purchaser of the wheat, in the position of principal contracting parties, would have to make good the contracts upon their own responsibility if necessary, and would, if delivery should be demanded when the time came, have to go upon the market and purchase the wheat for delivery. They not only knew that this would have to be done, but the evidence shows that, as to a part of these transactions, it actually was done; that the plaintiffs, in the execution of the contracts involved in this suit, actually purchased and delivered twenty-five thousand bushels of wheat for the defendants. The fact that the contracts for the delivery of the remaining thirty thousand bushels were settled by the payment of differences, upon a subsequent waiver of actual delivery by the purchaser, neither rendered them unlawful in their inception nor in their final execution ; for it has never been held that a lawful contract may not be discharged by the voluntary act of the obligee in accepting a pecuniary equivalent for its performance.

In this state of facts, what is the evidence upon which the defendant seeks to impeach its validity? It is his own testimony to the effect that, although the contract was such as is above named, yet his intention was not to buy or sell, but to gamble, and that the plaintiffs knew that this was his intention and made themselves the instruments of carrying out the same. He simply says in his testimony that these transactions were " option dealing ;" that by " option dealing " he means selling or buying wheat with the expectation of catching an advance or decline, betting that the price will go up or down, and that the plaintiffs were apprised of his intention in these matters. This, in connection with the fact that he was not a dealer in wheat, and had never bought or sold wheat for use or exportation, which fact was known to the plaintiffs, is the ground on

which the court was asked to give the following instruction : —

2. " The court instructs the jury that, if they believe from the evidence that defendant, in all the transactions in question, had no expectation or intention of delivering the wheat alleged to be sold by plaintiffs on his behalf, but only contemplated in such transactions speculative wagers upon the changes in the market prices of wheat,· to be settled by payment of differences only, and that plaintiffs were at the time of said transactions fully cognizant of and participated in this expectation and intention, and actually abetted, with such knowledge, said purpose of defendant, then it is immaterial that, as to parts of said transactions, plaintiffs made sales to third parties, as agents or brokers, and your verdict must be for defendant."

We think that the court committed no error in refusing this instruction. By holding otherwise we should, in effect, permit the defendant to say : The plaintiffs, acting as my agents, made certain lawful contracts ; they executed and discharged them for me in a lawful manner, and by their doing this I have incurred an indebtedness to them, but I ought not to pay this indebtedness, because my intentions were really unlawful, and they knew it.

We have not overlooked the case of *Fariera* v. *Gabell* ( 89 Pa. St. 89). That case fully sustains the defendant's position ; but no opinion was delivered by the supreme court other than a statement that the charge of the court at *nisi prius* was in accordance with former decisions of that court, and was approved. We can not reconcile it with the doctrine announced by the same court in *Smith* v. *Bouvier* ( 70 Pa. St. 325) and *Bruas's Appeal* ( 55 Pa. St. 294). It is pointedly opposed to the doctrine of nearly all the well-considered cases on the subject, and especially that of *Lehman* v. *Strassburger* ( 2 Wood C. Ct. 554) and *Sawyer* v. *Taggart* ( 14 Bush, 729). The doctrine there laid down cannot be reasoned upon without the result is reached, that

it involves an entire denial of the doctrine that the circumstance which renders these contracts unlawful is a contemporaneous agreement that they shall not be executed by delivery, but only by a settlement of differences. Unless there is such an agreement it is idle to talk about gambling intent, or wagering intent, or bets upon the future state of the market; because this is a mere play upon words. Every intent to speculate becomes in the opinion of some a gambling intent, and every mercantile venture involves in the same view a bet upon the state of the market. The law has distinctly defined the characteristic of a gambling contract when it takes the outward form of buying or selling for future delivery. To that definition we must adhere. The rule which we are asked to assent to by the learned counsel for the defendant in this case remits the whole subject to the loose discretion of juries, and puts it entirely at sea.

There is nothing in the case of *Barnard* v. *Backhaus* (52 Wis. 593), which necessarily conflicts with what we hold in this case. There, some of the contracts which entered into the consideration of the note sued on, " were contracts to pay the difference between the price of wheat, at the time the contracts were made, and the price at a subsequent time." *Ibid.*, p. 601. The court deemed it " clearly and satisfactorily proven that, in respect of some of the transactions, none of the parties intended an actual sale and purchase of wheat, but that the whole thing was to be settled by payment of differences." The court held, just as we should have held upon similar proof, that such transactions were gambling transactions, and that part of the consideration of the note, given to the broker, being tainted and void, the whole note was void.

The same may be said of *Tenney* v. *Foot* (4 Bradw. 594; s. c. affirmed 95 Ill. 99, 109). Whatever may have been said in the decision of that case by the learned circuit judge, whose opinion was approved by the appellate court

and by the supreme court, the indisputable fact was, that the agreement between the principal and the broker was, that the dealings of the latter for the former " should only be in options, and that no produce should be delivered or received on his account, but that the transactions should be settled upon the differences."  " This contract," added the learned judge, " was fully proved, and without any conflict of evidence as to it."  4 Bradw. 597.  Now, as there was a statute in Illinois prohibiting the dealing in " options," it was very clear that a note springing out of such a consideration, was void.  Upon such a state of facts, we should hold the same way without the aid of such a statute.  But in this case there was no such a contract.

2. Another point made for the defendant is, that the court erred in ruling that the burden of proof devolved on the defendant, to show the intent of the unknown principal parties, with whom the plaintiffs dealt in their own names for the defendant.  We understand that such is not the law.  These contracts were valid, according to their terms, though it was competent to show by extrinsic evidence that they were invalid.  They were, therefore, presumptively valid, and the burden of showing their invalidity lay upon the defendant, who attempted to impeach their validity.

3. The last question relates to the settlement of the transaction, known as the "August deal," that is, the sales which the plaintiffs made for the defendant's account, of wheat to be delivered at any time during the month of August, 1880, at the seller's option.  There was a loss on these transactions which the plaintiffs, acting as principal contractors, had to make good.  It appears that this "deal" was settled according to the ruling market at the end of that month.  But this market had been forced up to a fictitious point by a combination of dealers, in getting up what is called a " corner."  The evidence upon this point is not conflicting.  Now, the rules of the Merchants'

Exchange, which were a part of these contracts, contain the following provisions : —

" Section 4. In case any property contracted for future delivery is not delivered at maturity of contract, the purchaser may demand a settlement at the average market value of the property on the day of maturity of contract, and in case such settlement is refused, may purchase the property on the market for account of the seller during the same or the next business day, notifying him at once of such purchase, and any loss shall be due and payable at once by the party in default ;    *    *    *    but nothing in this section shall be construed as authorizing unjust or unreasonable claims based upon manipulated or fictitious markets.    *    *    *

" Section 5. In determining the average market value of any article the committee named, or, in case of arbitration, the committee of arbitration and appeals, shall consider its value in other markets or for manufacturing or consumptive purposes in this market, together with such other facts as may justly enter into a determination of its true value, to secure justice and equity to all concerned, irrespective of any fictitious price it may at the time be selling for in the market."    *    *    *

There was no evidence as to what the value of wheat at the end of August, 1880, was, either in other markets or in this market, for " manufacturing or consumptive purposes." The defendant asked the court to instruct the jury, that the burden was upon the plaintiffs to show what such market value was, and the court refused so to instruct them.    We think that this was error.    The plaintiffs were not obliged to settle these transactions upon the basis of a fictitious and manipulated market, produced by " cornering."    If they did so, they did so in their own wrong, because they could have avoided this under the rules of the exchange by demanding an arbitration.    They cannot, therefore, right-

fully charge up against their principal any loss which they may have sustained while acting as his brokers, in this way. As between him and them, the only market on the basis of which they can claim a settlement or charge losses against him, is an average market for manufacturing or consumptive purposes. It is just as much a part of their case to show what that market was as to show what their contract with the defendant was.

Upon this point alone, we feel constrained to reverse the judgment and remand the cause. It is so ordered. All the judges concur.