ELMER A. KENT ET AL., Respondents, *v.* E. B. MILTEN-
BERGER, Appellant.

### May 13, 1884.

1. PRACTICE — EVIDENCE. — The rejection of testimony, the exclusion of which can not prejudice the appellant, is not ground for the reversal of the judgment.
2. —— EXPERT TESTIMONY. — Opinions of witnesses upon matters as to which expert testimony is improper, are properly excluded.
3. —— Opinions written by the editor of, and published in, a commercial paper, as to the state of the market, are inadmissible in evidence.

4. CONTRACTS — MANIPULATED MARKETS. — It will not be held, as matter of law, that prices produced by speculation in articles of trade, are unreal or fictitious prices.

5. —— PRACTICE — JURY. — The question as to whether the prices at which settlements of contracts for the sale of grain on a given day, are fictitious, as based upon a manipulated market, or are true values for purposes of consumption or manufacture, is one for the jury.

6. —— A finding by a jury of the fact as to whether prices are true or fictitious, will not be disturbed on appeal upon the suggestion that it is contrary to the evidence, where there is any substantial evidence to support it.

APPEAL from the St. Louis Circuit Court, HORNER, J. *Affirmed.*

OVERALL & JUDSON, for the appellant: "Corners" of staple commodities, and contracts in furtherance thereof, are illegal. — *Coal Co.* v. *Coal Co.*, 68 Pa. St. 173; *Arnott* v. *Coal Co.*, 68 N. Y. 558; *Craft* v. *McConoughy*, 79 Ill. 346; *Raymond* v. *Leavitt*, 46 Mich. 447.

GIVEN CAMPBELL, for the respondents.

THOMPSON, J., delivered the opinion of the court.

This case was before the court at a former term (13 Mo. App. 503; 16 Cent. L. J. 431), on an appeal by the defendant, and, while sustaining the rulings of the circuit court on the other questions involved, we reversed the judgment because the court refused to instruct the jury that the burden was upon the plaintiff to show what the true value was of No. 2 wheat at the end of the month of August, 1880, for manufacturing or consumptive purposes. In so ruling this court used the following language: "It appears that this (August) 'deal' was settled according to the ruling market at the end of that month. But this market had been forced up to a fictitious point by a combination of dealers in getting up what is called a 'corner.' The evidence upon this point is not conflicting. * * * There was no evidence as to what the value of wheat at the end of August, 1880, was, either in other markets or in this market, for manufacturing or consumptive purposes. The

defendant asked the court to instruct the jury that the burden was upon the plaintiffs to show what such market value was, and the court refused so to instruct them.   We think that this was error.   The plaintiffs were not obliged to settle these transactions upon the basis of a fictitious and manipulated market produced by 'cornering.'   If they did so, they did so in their own wrong, because they could have avoided this, under the rules of the exchange, by demanding an arbitration.   They can not, therefore, rightfully charge up against their principal any loss which they may have sustained, while acting as his broker, in this way, as between him and them; the only market on the basis of which they can claim a settlement or charge losses against him, is an average market for manufacturing or consumptive purposes.   It is just as much a part of their case to show what that market was as to show what their contract with the defendant was."

When the cause went back to the circuit court the defendant amended his answer, setting up therein the two rules of the Merchants' Exchange of the city of St. Louis, upon the terms of which the ruling of this court had been based. These rules were as follows : —

"SECT. 4 — Rule 10. In case any property contracted for future delivery is not delivered at maturity of contract, the purchaser may demand a settlement at the average market value of the property on the day of maturity of contract, and in case such settlement is refused, may purchase the property on the market for account of the seller during the same or the next business day, notifying him at once of such purchase, and any loss shall be due and payable at once by the party in default.   *   *   *   Nothing in this section shall be construed as authorizing unjust or unreasonable claims based upon manipulated or fictitious markets.

"SECT. 5. In determining the average market value of any article, the committee named, or, in case of abitration, the committee of arbitration and appeals, shall consider its

value in other markets, or for manufacturing or consumptive purposes in this market, together with such other facts as may justly enter into a determination of its true value, to secure justice and equity to all concerned, irrespective of any fictitious price it may at the time be selling for in the market."

The answer then charged substantially that the deals in controversy were settled by the plaintiffs, not upon a legitimate market, as required by the above rules, but " upon a fictitious and manipulated market, wherein a fictitious and manipulated price for No. 2 red winter wheat for August delivery was produced by manipulation and cornering, so that the quoted market price in the St. Louis market for the said wheat was far in excess of its true value." The plaintiffs by a denial put these allegations in issue, and it was the only issue contested in the case. Everything else necessary to the recovery of the plaintiffs was either admitted by the defendant or went to the jury without objection. The jury returned a verdict in favor of the plaintiffs for the sum of $2,650.50, the same being, with interest, the whole amount claimed by the plaintiffs, on the basis of the full quoted price of the settlements of August wheat on the day when the plaintiffs closed out the defendant's deals because of his failure to put up more margins. It was the same verdict which was rendered on the former trial. From this verdict the plaintiffs remitted the sum of $155.50, and judgment was given for the residue, $2,495. The grounds on which the defendant, again appealing, asks us to reverse the judgment, will be now considered.

I. The first ground is that the court erred in refusing to give the fourth instruction asked by the plaintiff as offered, and in giving in its stead the same instructions with certain additions. This instruction, as offered, was as follows: " The court instructs the jury that if you find from the testimony that the St. Louis market for August wheat, at the time of the closing out or settlement of the August

deals in controversy, was cornered, that is, enhanced in price in excess of the true value by speculative manipulation, the plaintiff must establish by a preponderance of testimony, what was the true value of the wheat at said time, that is, the price at which the wheat would have sold, but for such speculative manipulation and cornering.''

The instruction which the court gave in lieu thereof was as follows, the additions being enclosed in brackets : —

'' The court instructs the jury that, if you find from the testimony that the St. Louis market for August wheat, at the time of the closing out or settlement of the August deals in controversy was cornered, that is, enhanced in price in excess of the true value [thereof for manufacturing or consumptive purposes] by speculative manipulation [so as to create a fictitious or manipulated market price], the plaintiff must establish, by a preponderance of testimony, what was the true value of the wheat at said time; that is, the price at which the wheat would have sold but for such speculative manipulation and cornering [for manufacturing or consumptive purposes].''

The court clearly committed no error in refusing the defendant's instruction as offered and in giving it as thus modified. By comparing the instruction as thus modified with the rules of the Merchants' Exchange, above set out, it will appear that the only difference between the two instructions was that the latter was more complete and specific, and embraced all the elements embraced in the two rules, one of which, namely, '' the value of the wheat for manufacturing or consumptive purposes '' embraced in the second rule, the instruction as offered omitted.

II. The next group of objections is that the court erred in excluding proper testimony.

1. The first of these objections relates to the testimony of Alexander H. Smith. This witness had testified, on his direct examination, that he could have purchased No. 2 red winter wheat at the quoted price on the last day of August,

1880, and made it into flour without loss, or with small profit, on the basis of the then quotations of prices of flour. On cross-examination he was asked the following question, to which the court sustained an objection: "How was that month of the. year — the month of August — compared with other seasons of the year in regard to the milling business in St. Louis as regards profits to be expected by the millers?" We do not see the relevancy of this question. Suppose the witness had been allowed to answer it, and had said that the profit had not been as great in the month of August as in other months of the year to the millers, what bearing would it have had upon the issue? What light would it have thrown upon the question whether the ruling market upon the Merchants' Exchange, at the date when these deals were settled, was a manipulated and fictitious market? But even suppose that the answer sought to be elicited would have had some relevancy, in the light of the whole testimony it is entirely clear that the defendant sustained no prejudice from the ruling.

2. On cross-examination of the same witness, the following question was asked by the defendant, and ruled out under objection: "Are you prepared to state what, in your judgment, No. 2 wheat would have sold for on the 31st of August if the market had not been oversold or had not been cornered?" We do not see that there was any error in excluding this question. It assumed what was in controversy, that the market on that day was cornered. It is true that the whole evidence does not leave much room to doubt that such was the fact, though one or two witnesses testified to the contrary. But it called for an opinion merely in respect of a matter about which the opinion of one intelligent man, having information as to the facts, is generally as good as that of another. We think it would be going to a great length of strictness to reverse a judgment because a merchant on the witness-stand was not allowed to give an opinion as to what the state of the

market would have been but for a circumstance the very existence of which was in controversy.

3. Another witness, J. B. M. Kehlor, was asked, on his cross-examination, by the defendant's counsel, the following question, which, under objection, was excluded: "Do you know whether or not a corner was run in the month of August?" We see no error in this ruling, because it appears on the same page of the transcript, that the witness having, in answer to a question put by the defendant's counsel, given his understanding of what a " corner " was, was asked and answered as follows: "Do you know whether or not any such circumstance [that is, a corner] did put up the price of wheat in this case?" A. "It is apparent to me, at that immediate time, it did;" so that the defendant got from this witness, in a more specific form, the answer which was manifestly sought to be elicited by the question excluded.

4. On cross-examination of the same witness, the following question was also put by the defendant's counsel, and, under objection, excluded: "Will you tell the jury now, right straight up and down — the question here is, whether this wheat, when it sold for ninety-nine cents on the 31st of August, was selling at a fictitious price?" No exception was saved to this ruling; but if there had been, it would have been unavailing, because, on the direct examination of the same witness, the same question had been put by the plaintiffs and excluded by the court upon objection by the defendant's counsel.

5. The files of a newspaper called the *St. Louis Daily Market Reporter* had been used by all the plaintiff's witnesses to refresh their recollection as to the price of wheat, based upon actual quotations on the days in controversy. Witnesses swore to the accuracy of the quotations in that publication, and the defendant's counsel admitted their accuracy. Mr. O'Connor, the publisher of that paper, being upon the witness stand, the defendant's counsel offered to

read from the issue of the same of September 1, 1880, the following statement: " Grade No. 2 red fell to its legitimate consumptive value to-day (millers and an order buyer took it), price tumbling nine cents after the close of the inflated August deal." Upon objection of defendant's counsel, the court excluded this, saying, " The statement of prices may be admitted, but a conclusion ought not to go in." This ruling was clearly correct. The matter offered was merely the opinion or comment of an editor upon the state of the market, not under oath, and was incompetent upon the clearest grounds. The fact that the quotations of prices, given by this publication, based upon actual reports of sales, had been put in evidence by the plaintiffs, did not at all estop them from objecting to allowing an opinion of the editor to go to the jury.

III. The final objection is more general. It is that " the verdict for the full amount claimed was clearly against the evidence and the law, and can not be sustained." We have read the record with care. The evidence tended to show that, during the month of August, 1880, the price of No. 2 red winter wheat in elevators at St. Louis, rose from about ninety cents a bushel on the first of the month, to ninety-nine cents on the last of the month. It also sufficiently appeared that there was, during the last days of the month of August, what is known in the slang of the exchange as a " corner," although one or two witnesses seemed to be of a different opinion. It also appeared that the ordinary difference in price between No. 2 red winter wheat and No. 3 red winter wheat on the St. Louis market, is about seven cents, but that, on the last day of August the difference had expanded to about sixteen cents. It further appeared that the 31st day of August was the last day upon which wheat which had been sold on the St. Louis exchange for " August delivery " could be delivered ; in other words, that those who had made such sales were obliged, in order to keep their contracts and save their business honor, to de-

liver before the close of business hours on that day. It further appeared that, before the close of business hours on August 31st, the price of No. 2 red winter wheat had reached the point of ninety-nine cents, and that, on the following day, it fell to ninety cents. It also appeared that wheat of the same grade as inspected No. 2 red winter wheat could be bought by millers in sacks, by sample, on the exchange, on the 31st of August, at from ninety to ninety-four cents, and that such wheat was so bought. But it also appeared that such wheat in sacks could not be made available for delivery upon contracts of sale such as the ones which this defendant, through these plaintiffs, as his agents, had made, without having it inspected, put into an elevator, and an elevator certificate issued for the same — a thing which would cost from a cent and a half to two cents a bushel, and which could not be done on that day in time for delivery.

On the other hand, it appeared by the testimony of several witnesses, that the quoted market price of No. 2 red winter wheat, upon the basis of which the plaintiffs closed out and settled the defendant's deal, was the real, and not a fictitious price ; that the same wheat, that is to say, No. 2 red winter wheat, delivered in elevators at St. Louis, could not be bought on the days named for any purpose, at a lower price ; that dealers had even on the last day of August bought it at the then ruling price for exportation, which means for shipment to Europe ; and that millers could have bought it on that day at the ruling price, and manufactured it into flour at a small profit, though it did not appear that any millers had so purchased it.

As to the real vital question whether the price of No. 2 red winter wheat, which had, during the last days of August, been forced up some eight or nine cents beyond its natural value, had been so forced by " manipulation," and that it was a " fictitious market," I must say that I can see no ground whatever for arriving at a conclusion different from

that at which the jury arrived. It pretty clearly appeared that there existed in the market, on the last day of August, what is called a " corner; " but it also sufficiently appeared that a corner is a resultant of perhaps three factors : 1. A deficiency in the expected amount of receipts for the given month. 2. An excess in the expected amount of exportations for such month. 3. That a number of men have sold for delivery during such month a greater amount of wheat than they have on hand which they can deliver, or than they can purchase upon the market for delivery before the close of such month. This, as the witnesses for the plaintiffs, who were merchants and millers, clearly explained, had the effect that, towards the close of the month, there were more buyers than sellers, and this put prices up. Those who sold more than they had on hand to deliver, called in the slang of the exchange " shorts," were trying to buy, in order to get grain to fill their contracts, and were competing in the market with each other for this purpose. This, of course, would enhance prices. Such a movement in prices, the testimony tended to show, though abnormal and temporary, was not necessarily fictitious; and we can discover no evidence in this record that the upward movement in the price of No. 2 red winter wheat, during the month of August, 1880, was the result of anything which could properly be called a manipulation, in any other sense than the sense in which the ordinary movements of trade can be called manipulations. There was absolutely no evidence that this abnormal advance in price of No. 2 red winter wheat was produced by anything beyond the fact that more wheat had been sold on the St. Louis market during that month than could be delivered, and that the buyers insisted upon the performance of their contracts. To say that a market thus produced is fictitious and manipulated would involve the overruling of the principles which were announced by the court at the former hearing of this case. Those principles

were that it is not unlawful for any man to sell wheat for future delivery, although he may not have it on hand at the date of the sale, and although he may sell it with the expectation of going upon the market and buying it in order to deliver it before the period allowed him in which to deliver it has transpired. When we say that such contracts are lawful, we are equally bound to say that a state of the market which appears to have been produced by no other cause than the ordinary making and taking of such contracts is not a manipulated or fictitious market. There was no evidence at this trial that the so-called "corner" of the last of August, 1880, was produced by any irregular action in trade, or by any combination or preconcerted conduct among dealers. If such evidence had appeared — if it had been shown that certain powerful dealers, having purchased largely of No. 2 red winter wheat for August delivery in St. Louis, had then combined for the purpose of depleting the market by exportation, or by preventing importations from the country, and, by this means, had forced the market to an unnatural price, we suppose that such a market would be what the merchants of the exchange meant by a manipulated or fictitious market when they framed the rules above quoted. But there was here no evidence of anything of the sort. On the contrary, it appeared from the testimony of one of the witnesses, Mr. Orthwein, that the market frequently "cornered itself," without any combination among dealers. The whole course of the testimony, as we read it, tends to the conclusion that the market had got into this state on the day in question in consequence of ordinary movements in trade, such as are allowed by law, and not in consequence of any conspiracy or combination against the laws of trade, such as the law condemns. All that the evidence fairly showed was that much more No. 2 red winter wheat had been sold for delivery in elevators in St. Louis during the month of August, 1880, than the sellers had to deliver.

They were consequently forced to buy such wheat for delivery where they could get it; and those who had it to sell, knowing the necessities of those who were obliged to buy, charged as much for it as they could get; and thus, by ordinary competition, the market went up to an abnormal point. As a general rule there is nothing unlawful in a person having a commodity to sell, charging as much for it as he can get; and whatever he can get, and does get, for his commodity on a day named, is its real value on that day, and is not a fictitious value. To hold, upon such evidence as this, that the defendant's contract could not have been lawfully settled upon the basis of the ruling price of the exchange on the day on which it was settled, would be, it seems to us, equivalent to holding that every price produced by speculation is an unreal and fictitious price, and that speculation is unlawful. We can not hold this, for it is not the law; but we must hold that the question at issue in this case, whether the price at which these contracts were settled represented the "true value" for "manufacturing or consumptive purposes" of the wheat at the time, or was a "fictitious price," "based upon manipulated and fictitious markets," within the meaning of the rules of the Merchant's Exchange, above set out, which rules entered into and formed a part of the contracts here sued on, was a question of fact for the jury; and that this question, having been contested before the jury, upon evidence tending to show the negative, and the jury having, under proper instructions, found in accordance with such evidence, their verdict is conclusive.

On the whole, it appears that the case was very fairly and carefully tried, in accordance with the former ruling of this court upon the question at issue. The judgment will therefore be affirmed. All the judges concur.